UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                )
SAMUEL DIAZ,                     )
                                 )
          Plaintiff,             )
                                 )
     v.                          )     C.A. No. 23-162 WES
                                 )
WAYNE SALISBURY, CAROLE DWYER,   )
KATHY LYONS, STEPHEN PERRY,      )
JOHN SHIMKUS, BENNETT GALLO,     )
JENNIFER CLARKE, KIMBERLY KANE,  )
NANCY RUOTOLO HULL, and JOHN DOE,)
                                 )
          Defendants.            )
_____ )
```

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, District Judge.

Plaintiff Samuel Diaz, a felon detained at the Adult Correctional Institute ("ACI") in Cranston, Rhode Island, filed his Third Amended Complaint ("TAC") alleging claims under the Eighth Amendment and state law. See TAC ¶¶ 79-107, ECF No. 63. Defendants Wayne Salisbury, Carole Dwyer, Kathy Lyons, Stephen Perry, John Shimkus, Bennett Gallo, Kimberly Kane, Nancy Ruotolo Hull, and John Doe (collectively, "Defendants") – all employees of the Rhode Island Department of Corrections ("RIDOC") – moved to dismiss.[1]  See Defs.' Mot. Dismiss Pl.'s TAC Failure State Claim

---

[1] The parties stipulated to Defendant Jennifer Clarke's dismissal.  Stipulation, ECF No. 66.

("Motion"), ECF No. 67.  For the reasons below, Defendants' Motion is granted in part and denied in part.

## I.   BACKGROUND[2]

The RIDOC designated Diaz for protective custody and, as a result, placed him in the M-Mod unit of the ACI Intake Center. Compl. ¶ 19.  Protective custody separates inmates from the general population when the inmates' safety is threatened.  Id. ¶¶ 20, 39. Under RIDOC's Protective Custody Policy ("Policy"), such a determination is made after several investigations conclude that there are no other reasonable alternatives that can safeguard an inmate's safety.  Id. ¶¶ 22-24.  The Warden ensures that the Policy is followed and that certain safety measures are in place and executed.  Id. ¶¶ 25-26.  The Policy also obligates the RIDOC to adequately screen and investigate inmates who are housed with those under protective custody.  Id. ¶¶ 28, 32.

Diaz is under protective custody because members of a local Rhode Island gang assaulted him several times while in Maximum Security.  Id. ¶ 21.  While Diaz resided in M-Mod, Dwyer and Lyons approved the assignment of detainees who were awaiting trial and sentencing to Diaz's unit.  Id. ¶ 29.  RIDOC officials did not

_____

[2] The Court assumes Diaz's factual allegations are true for the purpose of assessing Defendants' motion to dismiss.  See Pemental v. Sedgwick Claims Mgmt. Sys., Inc., No. CA 14-45-M, 2014 WL 2048279, at *1 n.2 (D.R.I. May 19, 2014) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

properly designate these detainees – as required by the Policy - before placing them among inmates under protective custody, including Diaz.  Id. ¶¶ 30-31.

One of those improperly placed detainees was George Tamba. Id. ¶¶ 33-34.  Though Tamba is a known gang member, Perry assigned Tamba to M-Mod without conducting a proper investigation.  Id. ¶¶ 35-37.  The placement of Tamba and other unscreened detainees in M-Mod created an obvious danger to Diaz and other inmates in protective custody.  Id. ¶¶ 38-42.

Then, in December 2022, using the common phone in M-Mod became an issue.  Id. ¶ 44.  Diaz complained to Dwyer and Lyons that he could not call his mother because other inmates monopolized phone time.  Id. ¶¶ 44-45.  Two months later, Dwyer or her designee, instituted the "phone list" by which corrections officers organized, monitored, and supervised phone use.  Id. ¶ 46.  This upset the M-Mod inmates, many of whom blamed Diaz for the "phone list," including Tamba.  Id. ¶¶ 47-49.

That same month, Diaz tried to use the phone, but inmates prevented him from doing so.  Id. ¶ 50.  An altercation took place in front of Shimkus.  Id.  Inmates, including Tamba, made known to Shimkus their disdain for Diaz and blamed him for the phone list. Id. ¶¶ 52-56.  Yet neither Shimkus, Gallo, nor any other RIDOC official did anything to remedy the hostility and threats directed towards Diaz.  Id. ¶ 57.

This all came to a head one morning in late February 2023. Id. ¶ 58.  During that time, inmates in M-Mod were in the common area while Shimkus was on duty.  Id. ¶¶ 58-59.  He then announced that M-Mod would be on lock down and that he would not be managing the phone list.  Id. ¶ 60.  After Shimkus left his post – which meant no corrections officers were present – Tamba got up and attacked Diaz while he was eating breakfast.[3]  Id. ¶¶ 64-65. Shimkus and Gallo responded to the attack against Diaz.  Id. ¶ 66.

Diaz was then brought to the medical area where Hull tended to his injuries.  Id. ¶ 67.  Hull, at first, did not send Diaz to the hospital until he suffered a seizure, prompting her to send him to Kent County Hospital.  Id.  While there, doctors diagnosed him with a broken ankle and fibula bone.  Id. ¶ 68.  Doctors advised that Diaz return for a follow-up visit in five to seven days.  Id. ¶ 69.  But Doe – someone who "worked in the medical services unit of the Intake Center at the time of this incident" - did not send Diaz to his follow-up appointment until seventeen days after the incident.  Id. ¶¶ 17, 70-71.  During that visit, doctors determined that Diaz needed immediate surgery on his leg. Id. ¶ 71.  Diaz's leg surgery would have been less extensive had he been brought to his follow-up appointment within the recommended

---

[3] This was not the first time Shimkus left his post.  The month before, while he left his post, a fight broke out over the phone list.  TAC ¶ 62.  Gallo knew about this incident.  Id. ¶ 63.

time frame.  Id. ¶ 72.  Following surgery, despite being prescribed pain medication, Diaz never received any medication from RIDOC staff.  Id. ¶ 73.  Diaz now has a large scar because of the surgery, experiences significant pain in his leg, and is likely permanently disabled.  Id. ¶ 76.

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must state a claim that is "plausible on its face" to survive a motion to dismiss.  Gartner Texas Props., LLC v. JPS Constr. and Design Inc., 516 F. Supp. 3d 173, 176 (D.R.I. 2021).  "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels us 'to draw on' our 'judicial experience and common sense.'"  Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).  The plaintiff, however, "need not demonstrate that [it] is likely to prevail . . . but [instead must] suggest 'more than a sheer possibility that a defendant has acted unlawfully.'"  Garcia-Catalan v. United States, 734 F.3d 100, 102-03 (1st Cir. 2013) (quoting Iqbal, 556 U.S. at 678).

The Court determines the plausibility of a claim through a two-step process: it first "isolate[s] and ignore[s] statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements[,]" while taking well-pled

5

allegations as true.  Schatz, 669 F.3d at 55.  Then, it determines whether the remaining allegations "plausibly narrate a claim for relief."  Id.  This evaluation requires the complaint to "be read as a whole [and] 'there need not be a one-to-one relationship between any single allegation and a necessary element of the cause of action.'"  Garcia-Catalan, 734 F.3d at 103 (quoting Rodríguez-Reyes vs. Molina-Rodríguez, 711 F.3d 49, 52-53 (1st Cir. 2013)).  Additionally, the Court must afford all reasonable inferences in the plaintiff's favor.  Rodríguez-Reyes, 711 F.3d at 53 (quoting Santiago v. Puerto Rico, 665 F.3d 61, 72 (1st Cir. 2011)).

## III.  DISCUSSION

Defendants' Motion focuses on Diaz's constitutional claims. Diaz alleges Defendants Salisbury, Dwyer, Lyons, and Perry violated his Eighth Amendment rights under a failure-to-protect theory by allowing unscreened detainees into the protective custody area which was the proximate cause of Diaz's injuries. See Compl. ¶¶ 79-83.  In a separate count, Diaz alleges that Defendants Shimkus and Gallo failed to protect him in violation of the Eighth Amendment by allowing Shimkus's post to go unattended amid hostility directed towards Diaz over the phone list.  See id. ¶¶ 88-95.  Then, Diaz alleges Defendants Kane, Hull, and Doe were deliberately indifferent to his medical needs after his assault by delaying his trip to his hospital on the day of the assault, and

then by not sending Diaz to his follow-up appointment as recommended by the hospital staff.  See id. ¶¶ 100-03.

Defendants argue that Diaz is improperly suing them in their official capacities.  As to Diaz's Eighth Amendment claims, Defendants argue that Diaz fails to state a claim against Defendants Salisbury, Dwyer, Lyons, and Kane in their supervisory capacities, and otherwise fails to state a claim for inadequate medical care.  Finally, Defendants contend that they are otherwise entitled to qualified immunity for their alleged actions.

## A. Whether Diaz May Sue Defendants in Their Official Capacities

Defendants argue that Diaz's § 1983 claims should be dismissed because he is seeking an unavailable remedy – damages against Defendants in their official capacities under § 1983.  Mem. Law Supp. Defs.' Mot. Dismiss Pl.'s TAC Failure State Claim ("Defs.' Mem.") 5-6, ECF No. 67-1 (relying on Will v. Michigan, 491 U.S. 58, 71 (1989)).  Diaz does not dispute the premise of Defendants' argument but asserts that Defendants are being sued both in their official and individual capacities, exposing them to potential damages under federal law.  Pl.'s Mem. Law Opp'n Defs.' Mot. Dismss Failure State Claim ("Pl.'s Mem.") 28, ECF No. 69; see TAC ¶¶ 9-17.  Even more, if successful, Diaz could be entitled to damages from Defendants in their official capacities under state law.  Pl.'s Mem. 28.

The Rhode Island General Assembly waived the state's sovereign immunity and authorized tort liability against the state "and any political subdivision thereof." Governmental Tort Liability Act ("GTLA"), R.I. Gen. Laws § 9-31-1. The Rhode Island Supreme Court has not read the GTLA in line with the rationale underlying § 1983. Feeney v. Napolitano, 825 A.3d 1, 5 (R.I. 2003). It has found that the statute does not bar money damages in an "official-capacity suit." Id. As a consolation, though, damages in official-capacity suits are limited by the GTLA. Id. at 4. Accordingly, the Court will decline Defendants' invitation to dismiss Diaz's claims to the extent that he seeks damages from them in their official capacities as such damages may be available under state law, though not under federal law.

**B. Whether Diaz Sufficiently States Claims under the Eighth Amendment**

Diaz brings two kinds of claims under the Eighth Amendment: 1) failure to protect and 2) deliberate indifference to serious medical needs. The constitutional protection from "cruel and unusual punishment" encompasses the government's obligation to protect inmates from known risks. Farmer v. Brennan, 511 U.S. 825, 832 (1994); see U.S. Const. amend. VIII. The protection requires prison officials to provide humane conditions of confinement. See Farmer, 511 U.S. at 832. But "[n]ot every injury suffered by a prisoner at the hands of another results in

8

constitutional liability on the part of prison officials." Burrell v. Hampshire Cnty., 307 F.3d 1, 7-8 (1st Cir. 2002) (citing Farmer, 511 U.S. at 834).

Both of Diaz's claims are measured against the same test, just in different contexts. The tests have both objective and subjective components: Diaz has the burden of proving that he faced "conditions imposing a substantial risk of serious harm" and that the prison officials exhibited "'deliberate indifference' to an inmate[']s health or safety." Id. (quoting Farmer, 511 U.S. at 835).

The "deliberate indifference" component itself has two parts. First, there must be a finding that a "prison official subjectively" is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. (quoting Farmer, 511 U.S. at 835); see Giroux v. Somerset Cnty., 178 F.3d 28, 32 (1st Cir. 1999) (likening the standard to "criminal recklessness"). Therefore, while "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious[,] . . . a prison official may show that even if the risks were obvious to others, it was not obvious to them." Burrell, 307 F.3d at 8 (citing Giroux, 178 F.3d at 32). Second, even if an official was aware of the risk, he "cannot be deliberately indifferent if [he] responded reasonably to the risk, even if the harm ultimately

9

was not avoided." Id. Thus, an unsuccessful, good-faith effort may defeat a claim that is "objectively, sufficiently serious." Id.

In the medical context, the Eighth Amendment is offended when a prison official's "acts or omissions [are] sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). Such "acts or omissions" only include a "narrow band of conduct," Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 162 (1st Cir. 2006) – treatment so inadequate as "to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind,'" Estelle, 429 U.S. at 105–06. Objectively, a "[a] medical need is 'serious' if it . . . has been diagnosed by a physician as mandating treatment, or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Gaudreault v. Mun. of Salem, 923 F.2d 203, 208 (1st Cir. 1990). And subjectively, "[d]eliberate indifference in this context may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with 'actual knowledge of impending harm, easily preventable.'" Ruiz-Rosa v. Rullan, 485 F.3d 150, 156 (1st Cir. 2007) (quoting Feeney, 464 F.3d at 161).

1. <u>Adequacy of Diaz's Eighth Amendment Claims Against Defendants Perry, Gallo, and Shimkus</u>

Diaz sufficiently states a claim under the Eighth Amendment as to Defendants Perry, Gallo, and Shimkus.  He satisfies prong one of the failure-to-protect claim by alleging that Defendants incarcerated him in conditions that objectively created a substantial risk of serious harm.  <u>See</u> <u>Ayotte v. Barnhart</u>, 973 F. Supp. 2d 70, 79 (D. Me. 2013).  RIDOC Policy requires that general inmates be screened before being placed among protected inmates, but Perry sanctioned the placement of detainees in M-Mod, many of whom, like Tamba, are affiliated with gangs.[4]  By failing to adequately screen those placed in M-Mod, Perry put Diaz at substantial risk of danger.

The alleged actions of Shimkus and Gallo exasperated the risk of danger.  Both Defendants knew of hostility towards Diaz

_____

[4] Defendants maintain that Diaz is merely bringing private causes of action for violations of RIDOC's policies and procedures. Defs.' Mem. 6-9.  But as Diaz correctly responds, referencing alleged violations of prison regulations does not mean his claims are based solely on those violations.  Pl.'s Mem. 16-18.  Nor do the violations by themselves establish an Eighth Amendment claim. <u>Id.</u> at 17.  Rather, the references are part of Diaz's case-in-chief for his failure-to-protect claim because it serves as potential evidence of Defendants' alleged culpable states of mind, a necessary component in demonstrating whether Defendants exhibited deliberate indifference. <u>Id.</u> at 16-18.  Courts elsewhere have noted the relevance and probative value of prison policies in evaluating a defendant's state of mind. <u>See, e.g.</u>, <u>Brooks v. Johnson</u>, 924 F.3d 104, 121-22 (4th Cir. 2019).  Accordingly, Defendants' Motion in this respect is denied.

concerning the phone list, neither Defendant took action. Moreover, Shimkus, left his post, creating the opportunity for inmates to fight among themselves. In fact, Tamba's assault on Diaz was not the first altercation that took place concerning the phone, and Gallo knew that the previous fight was precipitated because Shimkus left his post. These alleged events created a substantial risk of danger.

The same allegations support the subjective prong of the failure-to-protect claim. Despite his awareness of the Policy, and the fact that inmates, like Diaz, were in protective custody in M-Mod, Perry chose to disregard that Policy by declining to screen detainees before placing them in M-Mod. By disregarding the Policy's procedures, while aware of the dangers associated with mixing unscreened detainees with protected inmates, Perry exhibited deliberate indifference to a substantial risk. So too with Gallo and Shimkus: they demonstrated deliberate indifference by allowing hostile, unscreened detainees to interact with protected inmates while unsupervised. Gallo and Shimkus knew that Shimkus abandoning his post creating a danger, yet Shimkus – with Gallo's awareness – did so. In sum, Diaz has plausibly alleged that Defendants Perry, Shimkus, and Gallo allegedly displayed deliberate indifference.

2. Adequacy of Diaz's Eighth Amendment Claims Against Salisbury, Dwyer, Lyons, and Kane

Defendants seek dismissal of Diaz's Eighth Amendment claims against Salisbury, Lyons, Dwyer, and Kane ("Supervisor Defendants") because he is suing them under a respondeat superior theory, which is impermissible under § 1983. Defs.' Mem. 9-12. Diaz's TAC seeks to impose constitutional liability against the Supervisor Defendants for merely being supervisors, not for any direct or indirect acts or omissions that caused Diaz's purported injuries. Id. Diaz argues that he has sufficiently stated Eighth Amendment claims against Supervisor Defendants for their failure to protect and – in the case of Kane – for their deliberate indifference to Diaz's medical needs. Pl.'s Mem. 9-16. He also argues that such claims are made against Supervisor Defendants based on their individual actions, not their supervisory roles. Id. at 25-28.

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." Iqbal, 556 U.S. at 676; see Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 502 (1st Cir. 2011). Put differently, "[l]iability cannot rest on a defendant's position of authority alone." Penate v. Hanchett, 944 F.3d 358, 367 (1st Cir. 2019) (citing Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 16 (1st Cir. 2011)).

For a supervisor to be liable, the complaint must allege that her acts or omissions are the direct or indirect cause of the plaintiff's constitutional injury.  Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009).  Such conduct includes allegations that the supervisor is the "primary violator or direct participant in the rights-violating incident," or the "responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." Id. (quoting Camilo-Robles v. Zapata, 175 F.3d 41, 44 (1st Cir. 1999)).  Liability may also attach to a supervisor if her "conduct (whether action or inaction) constitutes 'supervisory encouragement, condonation or acquiescence[,] or gross negligence of the supervisor amounting to deliberate indifference.'" Grajales v. P.R. Port Auth., 682 F.3d 40, 47 (1st Cir. 2012) (quoting Welch v. Ciampa, 542 F.3d 927, 937 (1st Cir. 2008)).

To be sure, the plaintiff's allegations must make a "strong causal connection" between the supervisor's actions or inactions and the subordinate's behavior "such that the supervisor's conduct led inexorably to the constitutional violation." Penate, 944 F.3d at 367 (quoting Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 533 (1st Cir. 2011)) (internal quotations omitted).  Thus, the plaintiff's alleged injuries must be a foreseeable consequence of the supervisor's deliberate indifference to a known "grave risk

of harm" that could have been alleviated had proper measures been taken.  Id. (quoting Camilo-Robles, 151 F.3d at 7).

The Court will separately examine the allegations made against each Supervisor Defendant.  See Grajales, 682 F.3d at 47 ("[C]ase law requires a separate assessment of the potential liability of each of the defendants." (citing Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999)).

Defendant Salisbury.  Salisbury is the Director of the RIDOC. TAC ¶ 9.  Diaz alleges that, in his role, "Salisbury has the authority to establish correctional facilities and enforce correctional standards and policies; appoint [RIDOC] employees; manage, direct, and supervise RIDOC operations; establish, maintain, and administer programs for sentenced and detained prisoners; and establish and oversee the RIDOC classification system."  Id.  Diaz makes no other specific allegations against Salisbury.  For that reason, Diaz falls far short of alleging that Salisbury's acts or omissions have a "strong causal connection" to his alleged Eighth Amendment violation.  See Penate, 944 F.3d at 367.  Diaz only makes conclusory allegations that Salisbury had final authority over the Policy and disregarded the known risk of placing unscreened detainees with inmates under protective custody.  See TAC ¶¶ 9, 24, 81-82.  In essence, given the lack of specific factual allegations, Diaz sues Salisbury on his authority alone, which cannot be the basis of liability under § 1983.  See

15

Penate, 944 F.3d at 367.  Accordingly, Defendants' Motion is granted with respect to Diaz's Eighth Amendment claim against Defendant Salisbury.  See Feliciano-Hernandez, 663 F.3d at 535-36.

Defendants Dwyer and Lyons.  At the time of Diaz's assault, Dwyer was the Warden of the Intake Center, and Lyons was the Deputy Warden.  TAC ¶ 10.  Dwyer, with the help of Lyons, was "responsible for overseeing the operations of the Intake Center, supervising RIDOC staff at the Intake Center, and overseeing the implementation of RIDOC policies at the Intake Center," including the Policy at issue.  Id. ¶¶ 10-11, 29.  Diaz further alleges that both "approved the assignment of detainees who were awaiting trial and sentencing to M-Mod" even though they were not properly screened.  Id. ¶ 29. Even more, Diaz alleges that Dwyer and Lyons knew that assigning unscreened detainees with inmates under protective custody posed a risk to those inmates.  Id. ¶ 38.  Taken together, with reasonable inferences, these allegations create a sufficient link between Dwyer's and Lyons's individual actions and Diaz's alleged harm. And, as alleged, Dwyer's and Lyon's approval of this mixing practice amounted to a deliberate indifference of a known risk to inmates who required protection.  Dwyer's and Lyons's approval of the assignments proximately caused Diaz's injuries because Tamba was a pretrial detainee assigned to M-Mod who had not been

adequately investigated. Therefore, Diaz's Eighth Amendment failure-to-protect claim may proceed against Dwyer and Lyons.

Defendant Kane. Kane is RIDOC's Director of Nursing Services at the Intake Center. Id. ¶ 15. Diaz alleges that Kane was "aware that Mr. Diaz had suffered severe injuries as a result of the assault that occurred on February 28, 2023," but "nonetheless displayed deliberate indifference to Mr. Diaz's medical needs." Id. ¶ 102. There are no other factual allegations fleshing out that conclusory statement. Like Salisbury, Kane is being sued solely based on of her position of authority. There are no alleged facts that connect Kane's actions or omissions to Diaz's injuries. Accordingly, the Court grants Defendants' Motion with respect to Diaz's Eighth Amendment claim against Kane.

3. Adequacy of Diaz's Eighth Amendment Claim Against Hull and Doe for Deliberate Indifference to Serious Medical Needs

Under the Eighth Amendment, deliberate indifference to serious medical needs "may be found where the attention received is 'so clearly inadequate as to amount to a refusal to provide essential care.'" Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991). Such a claim cannot be based on mere "negligence," but on allegations that show "a conscious failure to provide medical services where they would be reasonably appropriate." Coscia v. Town of Pembroke, 659 F.3d 37, 39 (1st Cir. 2011); see Alsina-Ortiz v. Laboy, 400 F.3d 77, 82 (1st Cir. 2005) (defining

17

"deliberate indifference" as "a form of scienter in which the official culpably ignores or turns away from what is otherwise apparent").

Defendants heavily rely on Ferranti v. Moran, 618 F.2d 888 (1st Cir. 1980), for their argument that Diaz's allegations do not state a claim for inadequate medical treatment under the Eighth Amendment.  Defs.' Mem. 14-16.  There, the prisoner-plaintiff suffered back and spinal injuries from an accidental fall while in prison; he alleged that medical staff provided inadequate care and prevented him from seeing a back specialist at a neighboring hospital and were otherwise inattentive to his medical needs. Ferranti, 618 F.3d at 889.  According to the plaintiff, he suffered from back pain, headaches, dizziness, and insomnia as a result. Id.  The lower court dismissed the complaint for failure to state a claim.  Id. at 890.  The First Circuit affirmed, reasoning "the pleadings indicate[] that appellant's challenge focuses upon the quality and the source of the medical treatment received."  Id. at 890-91 (footnotes omitted).  Rather than show "deliberate indifference to his medical needs," the allegations reflected "a disagreement on the appropriate course of action."  Id. at 891. The claims may support a state-law tort claim for negligence, but they fell "short of alleging a constitutional violation."  Id.

To reiterate, after Tamba assaulted Diaz, staff wheelchaired Diaz to the medical area.  Id. ¶ 67.  Hull did not bring him to

the hospital at first but did so after Diaz experienced a seizure later that day.  Id.  He received an x-ray while at the hospital. Id. ¶ 68.  While the hospital recommended Diaz return to the hospital for a follow-up appointment in five to seven days, Doe brought Diaz to his appointment seventeen days later.  Id. ¶¶ 69-70.  During his follow-up treatment, Diaz received immediate surgery.  Id. ¶ 71.  Diaz alleges his surgery would have been less extensive had he done to the hospital as recommended.  Id. ¶¶ 69, 72.  After surgery, he was segregated from the rest of M-Mod because he had crutches.  Id. ¶ 74.  Medical staff eventually gave him a boot to replace his crutches and allowed him to return to M-Mod.  Id. ¶ 75.  Diaz also contends that staff have not been giving him his pain medication.  Id. ¶ 73.

Much of Diaz's allegations against Hull resemble those in Ferranti, in the sense that, while they may reflect a lack of best practice, they are not "repugnant to the conscience of mankind." Estelle, 429 U.S. at 105-06.  True, after the assault, Hull did not immediately send Diaz to the hospital but did so after he experienced a seizure.  Diaz received treatment at the hospital the same day as his injury.  This allegation does not suggest that Hull failed to treat a known and preventable harm.  Temporary delays in treatment do not support a claim for deliberate indifference under the Eighth Amendment.  See Casanova v. Hillsborough Cnty. Dep't of Corrs., No. 10-cv-485-JD, 2011 WL

3568347, at *10 (D.N.H. July 25, 2011), report and recommendation adopted, 2011 WL 3567463 (Aug. 12, 2011) (finding that a delay in sending the prisoner plaintiff to the hospital did not constitute deliberate indifference but "a lack of skill and sympathy, or . . . simply reflected the difficulty of diagnosing a fracture like [the plaintiff's] at the scene"). As in Ferranti, Diaz's complaint concerning the delay focuses on the quality of his care which may support a claim for negligence, but not a claim under the Eighth Amendment. 618 F.2d at 890-91; see Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014) (adequate medical care does not require "care that is ideal, or of the prisoner's choosing"). Nor are there allegations that Hull intended to inflict harm on Diaz or possessed a culpable state of mind. Thus, Diaz fails to state an Eighth Amendment claim against Hull.

The above reasoning applies to Diaz's allegations that he did not receive adequate care following his leg surgery. Compl. ¶ 102. First, he complains that he did not receive pain medication but fails to identify which Defendant was responsible for that decision. See Ruiz-Rosa, 485 F.3d at 154 (describing how a complaint "must at least set forth minimal facts as to who did what to whom, when, where, and why."). Second, he complains that he was segregated while he had crutches but eventually returned to M-Mod with a boot. Again, these allegations go to the quality of medical care, not the deprivation of care despite a substantial

risk, which cannot support a claim under the Eighth Amendment. Ferranti, 618 F.2d at 890-91; see Kosilek, 774 F.3 at 90 (describing how "it is not the place of our court to 'second guess medical judgments'" (quoting Layne v. Vinzant, 657 F.2d 468, 474 (1st Cir. 1981))).

Diaz does state a claim for Doe, however. Diaz alleges that Doe should have brought him to the hospital for a follow-up appointment about a week and a half sooner and that the delay worsened his conditions to the point of causing a possible permanent disability. See id. ¶¶ 70-72, 76, 102. The allegations satisfy the objective prong because, had Doe brought Diaz to his appointment as prescribed, he may not have needed extensive surgery or been saddled with the resulting harm. See Leavitt, 645 F.3d at 497. As to the subjective prong, Diaz's allegations create the inference that Doe was aware of Diaz's injuries and the fact that he was supposed to return to the doctor in five to seven days. See id. ¶¶ 67, 69-70. Despite recognizing this risk, Doe did not abide by the examining doctor's recommendation for a follow-up appointment. See Brison v. Wellpath, LLC, 662 F. Supp. 3d 67, 71, 74 (D. Mass. 2023) (allowing claims of deliberate indifference to proceed that alleged delays in follow-up treatment for prisoner plaintiff after surgery). In sum, the allegations sufficiently state an Eighth Amendment claim against Defendant Doe.

In the end, Diaz may proceed with his Eighth Amendment claim against Doe with respect to the alleged delay in treatment. Otherwise, Defendants' Motion is granted with respect to Hull and the other alleged medical care inadequacies.

**C. Qualified Immunity**

Defendants argue that qualified immunity shields them from liability in their individual capacities. Defs.' Mem. 7-8, 16-18; Defs.' Reply 1-2, ECF No. 71. "Government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

The First Circuit adopted a two-part test to assess whether an official is entitled to qualified immunity: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). The "clearly established" prong itself has two elements. The first one "focuses on the clarity of the law at the time of the violation," while the second "focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's

constitutional rights." <u>Penate</u>, 944 F.3d at 366 (quoting <u>Drumgold v. Callahan</u>, 707 F.3d 28, 42 (1st Cir. 2013)).

Courts must resolve questions of qualified immunity "at the earliest possible stage in litigation." <u>Haley v. City of Boston</u>, 657 F.3d 39, 47 (1st Cir. 2011) (quoting <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991) (per curiam)). Thus, if the question can be resolved on a motion to dismiss before the parties engage discovery, it should be. <u>See</u> <u>id.</u>; <u>Maldonado</u>, 568 F.3d at 268. But "advancing qualified immunity as grounds for a motion to dismiss is almost always a procedural mismatch, and the court will often lack the robust factual record it needs to decide whether an official is entitled to qualified immunity at this stage." <u>Jakuttis v. Town of Dracut</u>, 656 F. Supp. 3d 302, 318 (D. Mass. 2023) (citations and quotations omitted). Given this, factual development may be necessary and require the Court to defer the question to the summary judgment stage. <u>Giragosian v. Bettencourt</u>, 614 F.3d 25, 29 (1st Cir. 2010).

As to the first prong, the plaintiff must "plead adequately that the individual defendants violated his constitutional rights." <u>Feliciano-Hernandez v. Pereira-Castillo</u>, 663 F.3d 527, 532 (1st Cir. 2011). For the reasons stated above, Diaz has adequately stated constitutional violations against Defendants Dwyer, Lyons, Perry, Shimkus, Gallo, and Doe, but not against Salisbury, Kane, and Hull. Accordingly, Defendants Salisbury,

Kane, and Hull are entitled to qualified immunity based on the first prong of the qualified immunity analysis.   Whether the evidence supports Diaz's Eighth Amendment claims under failure-to-protect and inadequate medical care theories against the other Defendants is a question for another day after discovery.   If the discovered facts answer that question in the negative, Defendants may indeed be protected by qualified immunity.

As to the second prong, the Court pauses to observe the requirement for determining whether a right is "clearly established."   Defendants contend that they are not alleged to have violated a "clearly established" right because the situation here is unlike cases where inmates under protective custody were placed among the general population of sentenced inmates or where corrections officers did not supervise a protected inmate who was housed with an inmate in the general population.   Defs.' Reply 2 (citing cases).

True enough, but Defendants miss the forest for the trees. To be "clearly established," the law must be "sufficiently clear that every reasonable official would understand that what he is doing is unlawful."   District of Columbia v. Wesby, 583 U.S. 48, 63 (2018) (citations and quotation marks omitted).   The legal principle, at the time of the officer's conduct, must be "beyond debate," meaning that it has "a sufficiently clear foundation in then-existing precedent" and is "dictated by 'controlling

24

authority' or 'a robust consensus of cases of persuasive authority'" – not just "suggested" by precedent. Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741-41 (2011)). Consequently, this is a "demanding standard" that "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Id. at 589 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). The standard "requires a high 'degree of specificity,'" meaning that the legal principle must "clearly prohibit the officer's conduct in the particular circumstances before him." Id. at 590 (quoting Mullenix v. Luna, 577 U.S. 7, 13 (2015)). To be sure, there need not be a "case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." Al-Kidd, 563 U.S. at 741 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Thus, officers can "be on notice that their conduct violates established law even in novel factual circumstances." Irish v. Fowler, 979 F.3d 65, 76 (1st Cir. 2020) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)). So, a right can be "clearly established" even if the Court cannot, after scouring the Federal Reporter, find a case with almost identical facts. See id. at 77.

"When prison officials intentionally place prisoners in dangerous surroundings, when they intentionally ignore prisoners' serious medical needs, or when they are 'deliberately indifferent' either to prisoners' health or safety, they violate the Constitution." Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d

556, 558 (1st Cir. 1988); see Farmer, 511 U.S. at 828. Based on Diaz's not-so-novel allegations, the remaining Defendants would have been on notice that their failure to protect Diaz from unscreened detainees and their deliberate indifference to Diaz's medical needs could violate his constitutional rights. See Maldonado, 568 F.3d at 266. Accordingly, at this stage, the Court denies Defendants' Motion with respect to the remaining Defendants because they are not, at this stage in the case, entitled to qualified immunity. After discovery, the facts may tell a different story concerning whether there is a constitutional violation and whether a reasonable officer in Defendants' positions would have understood that their conduct violated Diaz's constitutional rights. See Penate, 944 F.3d at 366. The Court can revisit these questions once a factual record is developed.

## IV.  CONCLUSION

For the reasons above, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss Plaintiff's TAC for Failure to State a Claim, ECF No. 67. Defendants Salisbury, Kane, and Hull are entitled to qualified immunity on Diaz's constitutional claims. The Motion is denied with respect to Defendants Dwyer, Lyons, Perry, Shimkus, Gallo, and Doe.[5]

---

[5] Defendants did not address, and the Court did not consider, whether Diaz adequately states claims under state tort law. See TAC ¶¶ 84-87, 96-99, 104-07; see generally Defs.' Mot. Dismiss Pl.'s TAC Failure State Claim, ECF No. 67. Therefore, although

IT IS SO ORDERED.

William E. Smith
District Judge
Date: September 13, 2024

the Court has dismissed the federal claims against Defendants
Salisbury, Kane, and Hull, they each still face a separate state
law negligence claim.   The Court is authorized to retain
supplemental jurisdiction over these state law claims after it
pauses to reassess its basis for jurisdiction.   <u>See</u> 28 U.S.C. §
1367(a); <u>Doucette v. Jacobs</u>, 106 F.4th 156, 175 n.24 (1st Cir.
2024) (explaining that "[w]hen, as here, the federal claims upon
which supplemental jurisdiction is premised fall out of the case,"
the district court may still retain jurisdiction over the state
law claims after reassessing its jurisdiction under 28 U.S.C.
1367(c)).

Here, the dismissed federal claims faced by Defendants
Salisbury, Kane, and Hull still exist against other Defendants.
And those federal claims are necessarily entangled with the
remaining state law claims faced by Defendants Salisbury, Kane,
and Hull because they arise out of the same facts.   Accordingly,
the Court finds that "the balance of factors to be considered under
the pendent jurisdiction doctrine – judicial economy, convenience,
fairness, and comity," <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S.
343, 350 n.7 (1988), point toward the continued exercise of
supplemental jurisdiction over the remaining state law claims
against Defendants Salisbury, Kane, and Hull. <u>See, e.g.</u>, <u>Douglas
v. Lalumiere</u>, No. 2:20-CV-00227-JDL, 2022 WL 17832727, at *3-5 (D.
Me. Dec. 21, 2022), <u>report and recommendation adopted</u>, No. 2:20-
CV-00227-JDL, 2023 WL 2214426 (D. Me. Feb. 24, 2023).

27